# Bast and Others' Appeal.

1. There is an implied obligation amongst partners, that their property shall be used for the benefit of the firm, and that each partner shall not engage in any business which will deprive the partnership of a portion of his skill or diligence, or capital which he is bound to employ in it.

2. A partner is in a fiduciary relation to his fellows, and must account for all money received in and through the firm's legitimate business.

3. Before partners can be estopped from claiming the labor of one of their fellows or profits earned in the business, it must be *clear* that they have yielded their right to them.

4. In this case, transactions in the name of one partner, and intended by him for his individual benefit, held to be for the firm.

January 4th 1872.    Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ.    WILLIAMS, J., at Nisi Prius.

Appeal from the decree at Nisi Prius: In Equity.

The bill in this case was filed to January Term 1870, No. 16. It was by Emanuel Bast, Robert Taylor, and Robert M. Lindsay,

[Bast's Appeal.]

against Charlemagne Tower and John B. Heyl, executors, &c., of Davis Pearson, deceased.

The bill set out that the plaintiffs and Pearson had been partners under the name of Davis Pearson & Co., from January 1st 1865 to January 1st 1868; and that Pearson had received from Joseph C. Wright, $27,838.99 for the use of the partnership, of which Bast was entitled to one-third, Taylor and Lindsay each to one-sixth; that Pearson had not accounted for that sum, but claimed to retain it as his own.

The prayer was for an account and a decree for the payment of what should be found to be due. An answer and replication were filed, and C. H. T. Collis, Esq., appointed examiner and master. The articles of partnership were dated January 6th 1865. By them Pearson and Bast sold to the other partners for $20,833.33 each, one-third of the interest in their collieries, &c., their offices in Philadelphia, Ashland, and New York, and their wharf at Richmond, to be paid for with interest, from the profits of the business after deducting the necessary expenses of Taylor and Lindsay, not exceeding $1500 per annum; the partnership to continue until it should be dissolved by mutual consent.

The partnership was dissolved January 1st 1868; Pearson died July 21st 1868.

Pearson and Lindsay conducted the business at Philadelphia;— Bast at Ashland, and Taylor at New York.

In March 1865, the government advertised for coal to the amount, if necessary, of 3000 tons per day, during April, May, and June. A number of coal companies united in a bid for the coal; Pearson & Co. were not asked to join in the combination.

On the day the proposal for the coal was to be sent in to the quartermaster, John Tucker came to Pearson & Co.'s office; he told Pearson that he was in the confidence of the companies proposing for the coal, and had obtained from them the prices they intended to bid, and these companies having decided that there should be no opposition in bidding, Tucker advised Pearson to offer a bid somewhat less than the others had offered. Pearson informed Lindsay what Tucker had said to him, and after consultation with Lindsay, it was arranged that Flubacher, a clerk in the office of Pearson & Co., should make a proposal in his own name with Davis Pearson as his surety; Flubacher made a bid and it was accepted; the other companies assuming the contract was Pearson's, refused to sell him any coal, and announced that they would endeavor to prevent others from selling to him. After much negotiation, in which Tucker was very active, an instrument was executed of which the heading was:—

"Philadelphia, March 27th 1865.

Memorandum of agreement between the parties whose signatures are annexed hereto, who severally agree as follows:"—

This paper was signed by O. Wilson Davis, President New York & Schuylkill Coal Co., Tyler & Co., "Davis Pearson," and four other firms.

In pursuance of this agreement, Flubacher assigned his contract to Joseph C. Wright, as the representative of the association. The several parties were to furnish coal to Wright to fulfil the contract in the following proportions, viz: Pearson, The New York & Schuylkill Coal Co., and Tyler & Co., each one-sixth; the remainder to be furnished by the other four parties; the coal to be furnished to the association by the several parties at twenty-five cents per ton above the market price.

If there should be any differences amongst the parties they were to be settled by Tucker. The profits or loss were to be divided in the proportions in which the coal was to be furnished.

At the meetings of the association each company was represented by one of its members; Pearson attended,—none of his partners attended. There was testimony that it was a matter of doubt whether there would be profit or loss. "If General Grant had been defeated instead of Lee, it would have been a loss." All the other parties in the association treated the transaction as if the *firm* of Davis Pearson & Co., were one of the members, and the understanding was that the original contract had been awarded to the *firm*.

In the books of the association the accounts relating to the one-sixth represented by Pearson were kept in the name of "Davis Pearson & Co.," and the checks for payments were drawn in accordance with the entries. In the private books of Davis Pearson there were entries of the profits made by Lindsay to Pearson individually. Lindsay having received from the association $20,000 of the profits, signed the receipt, "Davis Pearson per Robert M. Lindsay." The only mine from which Pearson could furnish coal to the association was one belonging to Davis Pearson & Co.; that firm furnished coal to the association to the amount of $21,472.29, from which they realized a profit.

The contract with the government was filled and the business closed July 31st 1865; the value of the coal furnished the government was $1,012,565.59; the profit of the association was $167,033.98; the portion paid to Pearson was $27,838.99.

After closing the business Pearson paid one-half that amount to Tucker.

There was evidence that this division with Tucker was in consequence of a previous arrangement between Pearson and Tucker. Tucker testified that the sum paid him by Pearson "was not under a previous arrangement, but as a voluntary gift."

Gideon Bast, formerly one of the firm of Davis Pearson & Co., and father of Emanuel Bast, one of the plaintiffs, testified:—

"I knew of this coal-contract from my son. He told me about the contract. Shortly after this I came to Philadelphia and

broached the subject to Mr. Pearson at the office of Davis Pearson & Co. I said, 'Mr. Pearson, I understand that you have a large contract by the government.' He said, 'Yes, whereby we will make a good deal of money, but these boys don't thank me for it.'"

The master amongst other things reported:—

* * * "There is no evidence that from the awarding of this contract by the government, in March 1865, until the death of Davis Pearson, any claim was ever made upon him by his copartners for their *pro ratâ* share of the profits. Had such demand been made it could have been proved, if not directly, owing to the exclusion of plaintiffs as witnesses, certainly collaterally by the correspondence between Philadelphia, Ashland and New York, or otherwise. In February 1868, Mr. Bast retired, selling his interest to Taylor & Lindsay.

"In July 1868, Mr. Pearson died, and in November 1869 (four years and three months after the winding up of the contract), this bill is filed against his executors, claiming a *pro ratâ* share of the profits in that enterprise.

"There is no doubt whatever that the plaintiffs to this suit were fully aware of the fact that Mr. Pearson was a member of the association (which fact was communicated to them by Mr. Pearson himself before he went into it), formed to supply the government contract, and that they assisted the association by sales of coal. It is also clear that they never entered any protest or objection against Mr. Pearson becoming so associated. It also appears that nearly three years after the conclusion and winding up of this association, to wit, in February 1868, Mr. Emanuel Bast, one of the plaintiffs here, retired from the firm of Davis Pearson & Co. by selling his interest therein to Robert M. Lindsay and Robert Taylor for $20,000; the agreement executed by him at the time containing also the following language: 'I do hereby accept from Davis Pearson & Co. the sum of $24,146.50, which amount is in full for my one-third proportion of the capital of said firm of Bast & Pearson and Davis Pearson & Co. These sums, amounting to $44,146.50, cancel all my claims upon the firms of Davis Pearson & Co. and Bast & Pearson.' The document contains no reference whatever to any existing or contemplated claim against Davis Pearson or Davis Pearson & Co., for any share of the profits arising from the government contracts, which profit had been realized and passed to the credit of Davis Pearson nearly three years before, with the full knowledge of Lindsay, and at least the constructive knowledge of Taylor & Bast.

"It also appears that all money advanced to the association by Davis Pearson for the purchase of coal to fill the government contract was so advanced from the private means of Davis Pearson and not of Davis Pearson *& Co.* It is in evidence that one-half

the profits acquired by Davis Pearson were paid to Mr. John Tucker, but whether by previous arrangement with Mr. Tucker, is a question upon which the evidence conflicts ; and is immaterial to the issue, excepting so far as to illustrate the fact that Mr. Pearson deemed himself as having absolute control of said profits. * * *

"By the articles of copartnership admitting Lindsay & Taylor to the firm of Davis Pearson & Co., it appears that when this government contract was entered into Lindsay & Taylor each owed Bast & Pearson $20,833.33, which they were required to pay out of their accruing profits in the business of the concern, with legal interest on the same. This government contract would have wiped out over $9000 of their joint indebtedness, yet it is not shown they made any application therefor, or that Mr. Bast manifested any anxiety to collect the debt due him.

"It is proper to consider whether any reason existed why Mr. Pearson entered into this contract alone, and what that reason was. It is abundantly proved by the evidence of persons in the trade, and must be conceded to be the fact without regard to testimony, that this was a contract which involved extraordinary risk. It was to supply a government engaged in war, and in the midst of active operations, with coal for three months from date, to be paid for in certificates of indebtedness selling at a discount and redeemable in a depreciated currency, fluctuating with the vicissitudes of the war, the profit on the contract depending exclusively upon the success of the arms of the government. It is not unreasonable, therefore, to suppose that Mr. Pearson, who was a gentleman of large means, was willing to assume the risk, advancing no funds but his own and using none of the capital or stock of his firm for which the firm was not paid a higher rate than they could have obtained from any other party ; for it must be remembered that the contract to supply the government was at a fixed rate per ton, and Davis Pearson was the bondsman who guarantied that it should be so supplied for three months, whereas the coal supplied by Davis Pearson & Co. was to be paid for at 25 cents per ton above the market rates, which market rates of course were at all times regulated by the vicissitudes of war and the fluctuations in the money market. In the latter case the profit was a certainty, in the former it was at best a risk, and if the plaintiffs had elected to supply the association in preference to supplying the government, it would perhaps have been an exercise of sound and prudent judgment under the circumstances.

"There was another reason for Pearson being solely interested.

"Mr. John Tucker testifies that he thinks Mr. Pearson's chief object in bidding for the contract, was to teach the parties to the combination, that when future bids were to be made he could not be entirely ignored. He *underbid* the combination, and when

20 P. F. SMITH—20

the contract was awarded to him, or rather to his agent, he doubtless deemed himself bound to carry it out without incurring any risk for his copartners.

· " Upon this statement of facts proved by the testimony in the case, it would be difficult to apply any principle of law or of equity which would entitle the plaintiffs to a share in the profits realized from this transaction by Mr. Pearson. * * *

" The law may be stated to be 'that a partner cannot, either openly or secretly, lawfully carry on for his own benefit any business in *rivalry* with the firm to which he belongs;' but I know no rule which prevents a partner engaging at his own risk of profit and loss, in an enterprise which was in either event to bring profit to his firm, and from which enterprise his firm would obtain no profit, unless he did assume the risk.   Mr. Pearson did nothing ' clandestinely,' or 'behind the backs' of his copartners.   He obtained no advantage 'at the expense of,' or by 'throwing any burden upon' his copartners.   There was 'no fraudulent concealment.'   He did nothing which 'gave him a *bias* against the due discharge of his trust or confidence towards the plaintiffs;' on the contrary he placed himself, at his own risk, in a position which must have biassed him in their favor.

" Admitting that the bonâ fides and the fiduciary relation existing, required that Mr. Pearson should not engage in the business of selling coal, except as a member of his firm, still the long-continued silence and neglect of the other partners on the subject of their claim, is fairly open to no other explanation than that there was a mutual understanding upon the subject.   Add to this the acts of Lindsay in making the entries and signing the receipts, the act of Pearson in reference to Tucker, and the acts of all in reference to the retirement of Bast, and the circumstances cannot be reconciled with the theory of a joint interest; but I am drawn to the conclusion that there existed no difference of opinion among the parties as to Mr. Pearson being exclusively interested.   I report that the bill should be dismissed with costs."

Exceptions were filed to the report.

Their exceptions were dismissed at Nisi Prius, and the report confirmed.

The plaintiffs appealed to the court in banc, and assigned the confirmation of the report for error.

*W. H. Rawle* and *W. L. Hirst*, for appellants.

*F. C. Brewster*, Attorney-General, and *E. Olmsted*, for appellees.—One partner may carry on the same business with his firm, where there is no conflict; Story on Partnership, sect. 178, 179. The conduct of the other partners may raise a presumption of assent: Ex parte Harris, 1 Rose's Bankruptcy Cases 437; Jack-

son *v.* Sedgwick, 1 Wilson's Ch. C. 297 ; Cragg *v.* Ford, 1 Younge & Collyer 285.   Knowledge will be imputed when a proper investigation would have led to a discovery: Sadler *v.* Lee, 6 Beavan 324.

The opinion of the court was delivered, January 29th 1872, by

THOMPSON, C. J.—A careful consideration of the master's report, and the exceptions thereto, present very clearly, we think, a case wherein one partner, the defendant's testator, if he meant what they claim he did, attempted to realize profits for himself exclusively from and out of the business and capital of the firm, without authority from his copartners, and against the law of partnership generally.

There is always an implied obligation among partners " to use the property of the firm for the benefit of those whose property it is:" Collyer on Part., § 179.   So is it also an implied duty without any stipulation on the subject, that every partner shall abstain from engaging in any business which will " necessarily deprive the partnership of a portion of the skill, industry, diligence or capital which he is bound to employ therein:" Story on Part., § 177.   These are general principles regulating the duties and relations of partners, yet they may define them otherwise if they choose, provided they violate no positive law.   In the absence, however, of special provisions, each partner is in a fiduciary relation to his copartners, and must devote all his energies for the promotion of the firm exclusively, and account for all moneys received by him in and through its legitimate business.   These being the duties and obligations of every member of a partnership, he who claims exemption from them must show that it exists either in the terms of the organization, or by the assent of all his copartners.   It must, therefore, be clear that partners have yielded their right to the labor of one of their fellows, or of profits earned in the business, before they can be estopped from claiming them.

We do not mean to discuss in detail the testimony reported in the case, in testing the accuracy of the master's conclusions from it.   To some extent we must treat it in general views.   We need not argue to convince, but must investigate so that we may be well convinced ourselves of the proper conclusions to be deduced from the testimony.   This we have done, and the result is, we find no reservation in the articles of partnership establishing the firm of Davis Pearson & Company, which allows any member of it to contract and do business for his own sole benefit, in the business of the firm, or elsewhere.   Nor do we discover any *express* assent of the members of the firm otherwise, to that effect, in favor of Davis Pearson, for whom it is claimed by the appellees.   The opposite, it seems to us, is plainly inferable from the testimony of

Flubacher, the principal clerk of Davis Pearson & Co., and from other sources. According to him, a consultation was had between Davis Pearson and R. M. Lindsay, the only other resident partner at the time, after the former had ascertained how a bid might be put in for the government contract for coal, and be successful against other coal companies intending to bid, and it was agreed to bid for it in the name of their clerk Flubacher. The bid was made out at their office and put in by Flubacher, and the contract was awarded to him. A subsequent arrangement was made, by which several other companies became partners in the contract, and it was assigned to one Joseph C. Wright, as the agent or actuary of the association.

We have considered the testimony of Flubacher, on this branch of the case, with great care, and we discover no evidence of any assent whatever, by the members of the firm of Davis Pearson & Co., that Davis Pearson was to be the contractor with the government for the contract for himself, or that he was authorized so to contract with the association. Neither acts nor words in evidence, raise such an inference against his copartners. On the contrary, up to the time of the award of the contract to Flubacher, everything was done in the ordinary mode of transacting business in the firm. The resident partners consulted together, prepared the bid their clerk was to put in, and it was a matter inquired of by Pearson, whether the business of the contract could all be done in their office. This looks like anything else than an individual contract. But again : Flubacher was the clerk of the firm, not the servant of Pearson. In the absence of qualifying testimony that he was to bid for a particular member of the firm, the presumption would undoubtedly be that he acted for the firm, and not for one of its members. This would assuredly give the contract to the firm. But all this was done in the absence of Bast and Taylor, and even if Lindsay had assented to all that is assumed, it would not bind his absent copartners, who gave no assent precedent or subsequently. We are looking for an express assent that Pearson should contract for his own benefit, and alone share with the associated coal companies the profits to be made out of their contract to furnish coal to the government under the award to Flubacher. A few of the grounds for the assumption by the appellees will be noticed.

The most prominent of these is, that Pearson signed the articles of association of the coal companies in his own name, and not in that of his firm. In the absence of any authority given him to do this, the theory is, that he did it to save from possible loss his partners, if the adventure should prove a losing concern. But as this was not communicated to his partners, and not assented to by them, it would not entitle him to take all the profits. But this was surmise at best, and an unreasonable surmise. It was not

likely that the contract would prove hazardous, or a failing adventure, unless the government should be overthrown by the rebellion, a result not believed in or feared by anybody at the time.    The coal-mines were in the hands of the associators, from which any such amount of coal as was required, could be procured.    The wants of the government were pressing, and competition was impossible, for such an amount as was required, as rapidly as it was wanted.    There was nothing, therefore, to prevent the associators from making profits if they chose, and as they did.    The department certificates given in payment of coal, although at times slow of negotiation, were no real hazard, and was a fact most probably never thought of in making the contract, and resulted in no loss, or but little, and gives but slight support to the presumed self-sacrificing theory set up, that Pearson signed his own name instead of that of his firm to save his partners from the danger of eventual loss. Indeed, there is no evidence in the case to show knowledge of the partners that he had so signed the articles of association.    Bast and Taylor were absent, and it is not shown that they ever knew it until after this contest arose.    Nor is there any evidence that even Lindsay knew it.    Under no circumstances could they be presumed to have assented to what they did not know.

Another matter relied on, is Lindsay's signature to a receipt for Davis Pearson, for a portion of the profits of the contract of the association with the government.    It is probable that as Pearson alone had signed the contract, although unknown and unauthorized by his copartners, the receipt was put in that form by the clerk or cashier of the association, Mr. Wright, to accord with this fact, known doubtless to him, as he had the possession of the papers. Lindsay may too be presumed to have thought that the form of the receipt could not affect his firm in its right to profits, especially after having furnished the coal from which they were realized.

He might well conclude that if Pearson received the profits in his own name, it would furnish no reason why he should *retain* them.    This could not directly result from the act, nor alone, was it a circumstance to presume assent to the action of Pearson for his own benefit, and we do not see anything in the testimony which aids it.    Certainly not as against those knowing nothing of it.    Lindsay must have known that the associated companies regarded their firm as co-contractors.    He must have seen the books when the receipt was given, if not at other times, and they showed that his firm was credited with the profits, and not Davis Pearson, and thus he probably believed the form of the receipt an unimportant thing, as it was, in our judgment.    It did not estop him, nor any other copartner, from asserting the truth in the case.    Many better reasons might be given for Lindsay's receipt in the form it was given, than that he meant to do an act, or admit a fact, tending to cut himself out of four or five thousand

dollars, his share of the profits. With equal force, these views apply to the two entries made by Lindsay in Pearson's private books. These acts, standing against the rule of law, which bound Pearson to operate and contract only for the benefit of the firm, weigh but little. They were all equivocal, and also without the knowledge of his copartners. The significant fact against all this is, that these profits were derived. from the business, property and capital of the firm, and by the labor and skill of the partners. Although it is true, in one sense, that Davis Pearson furnished money to carry out the contract, he furnished it to his firm and had credit on their books for it. Thus the firm became debtor for the amount and took credit for the advance to the association. Nothing could be more indicative of an intent to act for the firm than this. Further: against this theory of Davis Pearson's title to these profits, are the facts that all his co-associators testify that the firm of Davis Pearson & Co. was their partner, not Davis Pearson individually. That they so understood it, is further evidenced from the fact that the representatives of the companies in charge of the business, consulted Lindsay about furnishing coal equally with Pearson, especially when the latter was not present. Again, the testimony of Gideon Bast, proves Pearson's admission to the fact, that the profits to be made were to be for the firm and not himself. "I said to Mr. Pearson," says the witness, " I understand you have a large contract by the government. He said yes, whereby we will make a good deal of money, but these boys don't thank me." He did not say, *I shall make a good deal of money*, but we will. The expression evidently alluded to his partners. His firm as a unit was to make the money, not a portion of it. Nor is it credible that he meant, that the "boys were only to share with him the extra twenty-five cents per ton for coal above the ordinary price of coal which the association agreed to charge. This would only give to Lindsay and Taylor, each owning a sixth interest in the firm, about $107 profits each, and himself, owning a third, twice that amount. Was this what he intended to describe as the " good deal of money" they were to make? It is inconceivable that a large operator, and a wealthy man, could have meant this by the words used.

It is claimed that the silence of Pearson's copartners about their profits for three years, is some proof that they did not expect to share in them. By itself, it is nothing, absolutely nothing. Does it help to interpret any other act or acts in the aspects claimed? We have considered this, and we think it does not. Circumstances to amount to proof, must point to and bear upon the facts to be proved, and be inconsistent with any opposite theory. A hundred reasons might account for this delay, just as satisfactorily, and more so than the one supposed. Pearson remained in the firm up to the time of his death, which occurred on the 21st of July 1868.

[Bast's Appeal.]

No final settlement had ever taken place between the members of the firm, and it was not an unreasonable presumption, or unnatural, that the younger members, knowing their money to be safe in his hands, awaited a period of final settlement, in confidence that the matter would be fully accounted for then. It will not do to hold their rights concluded by such a delay. Delays are common, even where much larger sums than that involved in this controversy, is in the hands of one party belonging to another. Whether the parties were silent on the subject among themselves or not, we know not, as death has fallen on one of them, and this closes the lips of the other partners. We think this principle is of little account.

In conclusion, the name in which these profits were received, amounts also to little against the name and fact in which they were earned, and which the defendants' testator must have known as a member of the association and firm both. His disposition of half of them by gift to Mr. Tucker, for the latter, in his testimony, repudiates any precedent contract to that effect, is no evidence of ownership, nor does it bind the firm. If he choose to give them away, it would not release him from accountability for them. His generosity must be at his own expense. He was a trustee for the firm, and could not legally apply the funds without the consent or assent of his copartners to anything but the firm business. The disposition he made of half these profits was not so applied. From a full consideration of the testimony, and the master's report, we think the latter erred in so finding the facts from the testimony as to recommend a dismissal of the plaintiffs' bill, and that the court erred in their *pro forma* decree dismissing said bill.

And now, January 29th 1872, the decree in this case dismissing the plaintiffs' bill, is *reversed*, and the same is hereby reinstated, and referred to the former master, Charles H. T. Collis, Esq., to state an account between the parties to the bill. The costs to abide the final decree of the court.